Good morning, Your Honors. Good morning. Evan Tago, representing the Impellant Insurance Companies. As the Court's aware, there has been quite a bit of briefing on quite a bit of issues in this case. And rather than rehashing the briefs, I thought what I would try to do today is discuss with the Court some observations that occurred to me about some of the issues as I was preparing for the argument, sort of a further refinement of some of the points. And I'm going to try to touch on seven if I have the time. Firstly, with respect to the total disability issue and specifically the usual or customary gloss, we don't deny that this term has a history, that it does appear in some cases dating back a century. But if you trace them back, what you see is that it has a very specific purpose. The purpose of the term usual or customary way is to preclude an argument that an insured is not disabled because she can perform her important duties with the assistance of someone else, for example. Excuse me. Counsel, could you please have a seat? We would like everyone seated in the courtroom. Thank you. Or by using some kind of device that he or she never used before. Or by working in pain. So if you trace back these cases, you can see that the usual or customary way is used to preclude those kinds of arguments. To take an example, if a lawyer suddenly loses his or her sight, the cases would say that the lawyer does not have to hire a reader in order to qualify for total disability benefits, because using a reader is not the usual or customary way. Well, in this case, there was no dispute that the plaintiff was unable to perform one of her important duties, invasive procedures, in the usual or customary way. Therefore, the inclusion of it in the case could only cause mischief, and that's precisely what happened here. I don't get your argument, counsel. I don't. You acknowledge that usual and customary is part of the vernacular in determining disability, but yet you say it's not applicable in this case, and why is that? It's not applicable because there's no dispute that there's one duty that she can't perform. So what the plaintiff successfully did in this case was they transmogrified this term of art and used it for a totally different purpose. But if that's her job, if her job is being an invasive cardiologist, and that's what she does, and she can no longer do that particular job, why is that inappropriate to say that she can't do it in the usual and customary way? Because it is not about what is her job. It is about what are her duties. And she listed four or five duties on her claim form. What did the policy actually say about disability, whether or not you could do your duties or whether or not you could perform your job in the usual and customary way? I think it's the duties of your occupation. It doesn't use usual and customary at all, by the way. All right. That's not in there. All I'm saying is that in some judicial opinions, courts occasionally use that term. But our point here is you don't willy-nilly import language into jury instructions when it doesn't serve a purpose and when it can only confuse. And in this case ---- What's our standard of review on whether or not the court erred in using that phrase in the jury instructions? It's abuse of discretion, isn't it? Well, it's an abuse of discretion, but it was legal error, because it was understood by all at the plaintiff's representation that what the term meant was if she could not do one of her duties, she was no longer performing her job in the usual and customary way because her job includes a bundle of duties. What were the duties she could still perform, in your view? She could perform everything else. She could continue to look at patients. She did all of her hospital rounds. The only thing she couldn't do is catheterize her patients. Now, a lot of patients that come to a cardiologist never need catheterization. I think it's important to understand that she doesn't have a shingle out in front of her office that says I'm an invasive cardiologist and this is all I do. She's a cardiologist. She takes in all these patients, whatever their needs are. Sometimes they need invasive procedures, sometimes they don't. She, by her own estimate, said she spends about 6% to 7% of her time on invasive procedures, but that's just one of the important duties. But counsel, didn't the insurance company accept her application and classify her as an invasive cardiologist? There's no dispute about that, is there? Well, first of all, I don't think they did classify her as an invasive cardiologist. They described her as an invasive cardiologist. They said she describes herself as that. But their job, and they've always said this throughout the case, and it's right, based on the policy, their job is to look at the duties and see which ones can she perform and which ones can't she perform. So it's your argument that she's a self-described invasive cardiologist and that term was never adopted by the insurance company. Is that your argument? The argument is that the term is not what determines whether or not she's entitled to benefit. But my question to you was, was that description of her job ever adopted by the insurance company? I don't recall. I don't think it was, but I'll confirm that with my colleague. I don't think they ever embraced the concept, okay, she is, after all, remember, Your Honor, there is no board certificate, there's no recognized subspecialty, as we pointed out in her briefs, in our briefs. Excuse me. Aren't you really arguing that she has partial disability rather than total disability? That's the ‑‑ well, if she satisfies the ‑‑ You say she could still do some things that a cardiologist does. Yes. Well, why did it take the company so long to get around to making that argument? They've been stonewalling for two or three years while they didn't owe her anything. They didn't owe her anything because she was working so hard, she never suffered the wage loss she needed to. To be partially disabled, they always said she does qualify for partially disabled if she meets the 20% wage loss. But she felt that she had to keep working because it was an all or nothing affair in her mind, and therefore she never suffered the wage loss. There was no stonewalling. They kept asking her for documents. And as we pointed out in our briefs, she didn't start sending them for over a year later. So I think that's a misperception, Your Honor. Was there a finding of fact regarding whether or not she failed to send documents? Because this was tried. A special finding by the jury? Yeah. No. Did she agree that she didn't send documents? Yes, she did. Wasn't there a dispute about whether or not she sent the documents and they were lost or the same documents kept being requested? She conceded that for the first year or so she never sent a single document. There was something about later she felt she had sent stuff that we had said we didn't receive, and that was towards the end of the process. The bottom line, however, was that the documents never established that she suffered the relevant wage loss. Counsel, this was more than a document case. I mean, she was videotaped in North Carolina. I mean, this was a pretty aggressive claims handling history for this particular woman. Well, sure it was. But they had, from the insurer's perspective, this claim had some suspicious features. This was somebody who had applied to a fellowship over a year before she submitted her claim. The fellowship would have required her to move to North Carolina for a year. She would not have been able to continue maintaining her practice. Then she puts off the acceptance of that for a year, files her disability claim, and then suffers no wage loss until after she sells her practice without telling them that she was going to do so, and then takes off for Duke. So the fact that they chose to surveil her while they were at Duke I think is a perfectly rational thing, given that with which they were confronted. But surveillance alone doesn't – I mean, that's a common feature of large insurance claims. They didn't violate her privacy. You know, there was no snooping around in windows or that sort of thing. But I don't think that that adds any weight to a finding that they were engaged in bad faith. Let me quickly move to some of my other points, if I may. This idea about usual or customary in the way in which it was transmogrified here to mean if you can't do one of your duties, then you must be totally disabled because it's no longer your usual customary way dovetails nicely into the problems with the Prater testimony. Now, as we pointed out in our brief, this is a witness whose basic – his basic job is to present advocacy in the garb of expertise. And nothing really shows it more clearly than the fact that nine times during his testimony, after the judge essentially abdicated responsibility for interpreting the policy to him, nine times he injects the usual or customary language when interpreting the insurance policy. And then he uses that to reach – the culmination is to say, well, she must be totally disabled because she can't do this one important duty. It's precisely for that reason, Your Honors, that you must draw the line in this case and say put an end to the hiring of these hired gun plaintiff's expert witnesses who will just come in and mouth the case for the lawyers who hired them. Counsel, was that objection to the use of usual and customary, was that made at trial? There were – yeah, there was – the objections to the instruction were made during the trial. But not on the basis that it was – that usual and customary was improperly imported into that instruction. That particular argument was not made at trial, was it? Well, the argument was that it had no valid role to play in this case. I don't know that they traced it back the way I have and saw that it performs this other function, which was irrelevant. They simply said, look, stick with the policy. This thing is being misused here. They were exactly – They didn't say this thing. It just – the objection to that instruction was that it was duplicative, confusing, and placed undue emphasis on part of the contract. That was the objection that was made. But there was a lot more that was said during the course of this. And one of the things that happened was that the plaintiff's lawyer – the judge originally agreed with us not to do it. And then the plaintiff persuaded him that after Judy Renahan testified and said, well, there's this list of duties, and if she can't do them all, she's not totally – if she can do any of them, she's not totally disabled. And then the judge said, okay, let's give this instruction. And that was clearly over an objection. But can you state in the record where specifically an objection was made to including the usual and customary portion of that instruction in there? Is that – Yes, that's definitely – that was what – But there is a specific objection to that instruction on that basis. I can't swear to you exactly what words were used, but I submit that they were certainly – they certainly put the judge on notice about why we felt it was not appropriate to instruct the jury on these words, which had no role to play in the case. Where is that in the record? Where is that objection in the record, where you said the judge was put on notice that usual and customary should not be part of the instruction? Where is that in the record? Well, there was a colloquy, but we've cited it in detail in our reply brief after the plaintiffs raised this waiver argument saying we didn't adequately preserve it. It would be the red brief, Judge Goodwin. It's cross-appeal, so there are two red briefs. You got the page? Can I move on to another and then we'll get you that page? On the provident document, we've – I think we've laid out in sufficient detail why a lot of these evidentiary rulings having to do with the documents were both wrong and highly prejudicial, but one thing occurred to me as I was preparing for this that I think puts it all into context. If you look at page 13 of the plaintiff's red brief, this is what they say. The adjuster's instructions, this is to the field representative, laid out the theory of the case that Paul Revere had already formulated as their justification for wrongly denying CMO's claim. Okay, that took place on November 22, 1995, 16 months before the merger with Provident. Now, if that is so, if it is the case that Paul Revere already had begun thinking that this claim was not a total disability claim because of the other duties, the entire justification for admitting all these highly inflammatory pre-merger Provident documents is obliterated. The whole theory of admitting them was that Provident was involved in handling this claim, which was never true, but their concession on page 13 of their brief that the theory for denying the claim existed 16 months before the merger I think proves the point. And it distinguishes, by the way, the Hangarter case in which the claim was not even filed until after the merger, and I think that's one of the basis on which the Court held that the documents were admissible there, but this is very different. Relatedly, Your Honors, I think if you read the key cases, Gatecliff and Sparks, you have to come to the conclusion that Provident Life was never a proper defendant in this case. And the significance of that is it eliminates the only thin veneer they even had for admitting all of these pre-merger Provident documents, if it wasn't even properly a defendant, the fig leaf was gone, and this very inflammatory evidence never should have come into the case. Quickly on to two liability points. On the bad faith point, I think the key thing to appreciate here is there are literally a dozen cases that have interpreted this policy the way Paul Revere did. If that's the case, how can it possibly be bad faith to do so? So we should get JMOL on that point. On punitive liability, which you shouldn't even need to reach, in the Hangarter case, this Court upheld the finding of punitive liability largely because of its view that, quote, California courts have upheld the awarding of punitive damages based on conduct nearly identical to that alleged of defendants. Here, precisely the opposite is the case. The Arizona case has taken an extraordinarily stringent approach to allowing punitive damages. If you compare the conduct here to the conduct in Linthicum, Garul, and Fulaski, I think you would have to conclude that the Arizona courts would have granted us JNLV on this point. Finally, on the amount of punitive damages, which has been briefed in great detail, the only final point I want to make is that the Baines v. Arco decision is a very, very significant development in this circuit. This Court held there that a $5 million punitive award for ethnicity discrimination was grossly excessive and ordered a remitter to between $300,000 and $450,000. Wasn't that counsel, though, because of the cap that's in the Civil Rights Act? Well, the Court wasn't bound by the cap. It merely looked at that as one of the guideposts. In our case, the guidepost is $5,000, the fine for violating the Arizona Unfair Claims Handling Practices Act. So that's affirmatively favorable to us. But the point I wanted to make was the Court there said there can be no excuse for intentional repeated ethnic harassment, and indeed there cannot be. And we submit that the $7 million punitive award in this case and Baines cannot coexist. If a $5 million punitive award was unconstitutional in a case that involves such inexcusable, deliberate, heinous conduct, it has to be the case that the $7 million award here is even more excessive. So therefore, Your Honors, if you even need to reach the issue of the punitive damages, we submit that it has to be further substantially reduced. Counsel, would you think that the nationwide scope of a practice should figure into the equation in terms of calculating punitive damages as opposed to maybe an individualized practice? Well, I think it's clear from State Farm, Your Honor, that an individual jury is not entitled to act as if it was conducting a market conduct exam or overseeing a class action. The job of the jury is to punish the defendant for what it did to the plaintiff and nothing more. Furthermore, in this case, while they have these documents that they were able to spin and say indicated bad company practices, there's not a single width of evidence that any other insured, not a single one, had a claim that was invalidly denied. It is an improper inference to make that this jury was properly punishing for a nationwide course of conduct. But would that be an appropriate consideration for the jury? The jury can't punish for it. Can it consider it engaging reprehensibility if there's actually evidence of it? Yes. But that might justify a ratio of two to one instead of one to one. It doesn't justify this bloated $79 million reward or even the $7 million reward that was imposed here. If 5 million is way too much for what was done in Baines, it seems to me that 7 million is too much. What were the compensatory damages in Baines? $50,000. Okay. So that ratio was much higher. Yes. There was a higher ratio. But it does cut in our favor in this case because in this case, as you know, there's $5.47 million of emotional distress damages, which we strongly submit needs to be vacated entirely. But insofar as you leave any of it standing, that by itself should have adequate deterrent function. And you don't need much more at all to adequately deter and punish what happened in this case. With the Court's permission, I'd like to reserve some time for rebuttal. All right. I'll give you a couple minutes for rebuttal. Thank you, Your Honor. Good morning. Good morning. May it please the Court, my name is Rick Friedman, and together with my co-counsel, Tom Hudson, I represent Dr. Simo in this case. Judge Martone, our trial judge, before he was appointed to the Federal bench in 2002, spent seven years in the Arizona trial courts and ten years on the Arizona Supreme Court, where he wrote or participated in many of the decisions we've cited to this Court, Arizona Supreme Court decisions. Judge Martone, after presiding over this trial and in considering the post-trial motions, didn't say a reasonable jury could find in our favor. He didn't say we'd presented a strong case. He said we'd presented a strong case. What he said is that the evidence and the defendant's witnesses left the jury no choice but to find as it did. That being the case, I'm not inclined to spend a lot of time arguing the facts to this panel. What I would like to do is address three legal issues, one, the usual and customary jury instruction that Mr. Tager was just addressing, two, the amount and how the emotional distress award was arrived at, and three, the punitive damage amount. The emotion or the usual and customary argument can be addressed relatively quickly. The Court was right when the defense objected to the usual and customary argument, the defense or the usual and customary instruction. Let me go back. They did not object to the our supplement to that that had the usual and customary language in it. The judge initially refused to give that instruction. The defense argued, basically the trial judge said, I don't think this adds anything. And the defense said, we agree. It doesn't add anything. It's duplicative. It adds confusion. After another defense witness testified, the judge reconsidered and said, now I can see why it might be appropriate to give this instruction. The defense said simply same objections, meaning the same objections they had made before, that it doesn't add anything, it's duplicative, and it adds confusion. They never argued, as they argue in this appeal, that this amounted to a directed verdict. They never argued, as they argue in this appeal, that this is an inaccurate statement of the law. I think the reason they couldn't and didn't argue that it was an inaccurate statement of the law is that there are two Arizona appellate courts directly on point, Nystrom and Radowski, both of which specifically adopt the usual and customary standard. And go even further, they acknowledge that if a person with an own occupation policy can't do a duty, what we sometimes call an occupationally defining duty, a firefighter who can't fight fires but can sit in the station and work on equipment and so on, if you can't do your occupationally defining duty, you're totally disabled. Well, counsel, what is your response to opposing counsel's argument that invasive cardiology is not an occupation, that this, that the invasive portion of it was a relatively small portion of her responsibilities, and that not all patients require that? Well, a couple responses. First, I think there are a lot of invasive cardiologists who would be surprised to hear there is no such specialty. The record shows that Ms. Simo, or Dr. Simo, had to attend a two-year program to become an invasive cardiologist. Basically, when you go into a cardiology residency, you have a choice of choosing a non-invasive tract or an invasive tract. And she testified at length about the rigors of the invasive tract and how a lot of people drop out of the invasive tract and go to the non-invasive. That would be point number one. Point number two, she testified, as the only cardiologist or invasive cardiologist who testified at trial, she testified that the 6 to 7 percent of the time she's actually performing the procedures is, in fact, about average for invasive cardiologists. The obvious analogy is trial lawyer. I like to think of myself as a trial lawyer. I'm probably in trial 2 percent of my time, maybe 3 percent. On the phone, I could still sit in front of my computer, what I do 98 percent of the time. But if I can't go into court, I'm no longer a trial lawyer and I'm disabled from my occupation. She spent 6 to 7 percent of her time, and as she testified, that's about average for an invasive cardiologist. Counsel, this is a friendly question. Isn't it significant that the policy ensured against her disability in her regular occupation? Absolutely. Whatever that was. That's absolutely right. And it's at the time that she becomes disabled. So just out of intellectual curiosity, if she'd switched from becoming an invasive cardiologist to becoming a trial lawyer between the time she bought the policy and the time she became disabled, they were required to insure her as a trial lawyer. Obviously, that's not our situation. Counsel, what's your response to opposing counsel's insinuation that there was something a little fishy about the timing of the disability application? Well, the shortest response is what Judge Martone said. The fact is she considered and this got all, I mean, the quickest response is that's what the jury decided. They were alleging essentially fraud at trial. And the jury clearly rejected that she was planning, she always wanted to expand her invasive cardiology practice into geriatrics. She originally applied, realized she was too ill to go, stopped the pursuit of that. Another year passed, and then she got even worse, and then she's dropping. So it's a complicated fact pattern that was argued at length. But basically, there was an innocent explanation and a fraudulent explanation. The jury clearly rejected the fraudulent explanation. And what's your response to opposing counsel's argument that Ms. Simo did not submit any requested documents for a year? It's true. And they, the company, cannot be held responsible for that year. So it took two years before they denied her claim, not three. Absolutely. And the reason is, as she testified, I did not want to accept that I was disabled. I did not want to make this claim. If anything, I think that, again, cuts against any argument of fraud. The instruction was correct under Nystrom and Radowski, the two applicable Arizona cases. I'm going to move on now to the Emotional Mental Distress Award, something that's vigorously attacked by the defense. There are really two aspects to the emotional mental distress argument, two issues. Did the jury disregard the judge's instructions and award Dr. Simo past and future policy benefits and no emotional mental distress? And secondly, is the amount of the jury awarded for mental and emotional distress unreasonable, outrageous, and beyond all measure, which is the Arizona standard for setting aside a verdict or ordering remitted her? The jury in this case was specifically told by the judge not to put contract damages into the bad faith verdict. And that's at trial transcript 1932 and again at 1940. He specifically told them that in response to a defense concern that there might be double recourse to recovery or that what happened, what the defendants are arguing happened, might actually happen. So he specifically put at 1932 and at 1940 instructions to the jury saying, don't put the contract damages, if you awarded them under the contract, don't put the policy benefits here. Interestingly, the award is completely consistent with what was argued below by the plaintiff, that the emotional and mental distress inflicted was at least as much as the benefits of her policy. There is no reason to speculate that the jury did something contrary to what the judge instructed and what plaintiff's counsel argued. No reason to look for miscalculation or misapplication by the jury. Essentially what the defendants ask you to do is speculate that the jury disregarded the judge's instructions and implied some sort of Rube Goldberg mathematical formula to arrive at this particular verdict. There's no evidence to support that that's what they did. And their argument also presumes that the jury intended to award nothing for mental and emotional distress. As to the next question, whether the jury awarded award is unreasonable, outrageous, and beyond all measure, we have to concede it's a high award. There's no question about that. And basically that leaves two possibilities. Either the jury did something wrong or the evidence was very strong. Judge Martone concluded the evidence was very strong. And there was evidence from which the jury could find that Dr. Simo basically, as she put it, was her practice. She was the first woman cardiologist, invasive cardiologist in the State of Arizona. The evidence shows that she wasn't exactly welcomed by her colleagues with open arms. She had to fight every inch of her career to build this practice against quite a few odds. The evidence also would support a jury finding that she could not hire the help she needed when she first became ill because the benefits were not paid, that as a result she was working more hours than she should have been, pushing herself harder than she should have been, that this impacted her physical health, impacted her professional reputation, that she went without treatment she needed, which made her health worse. The jury could find, finally, that she lost her practice because of the failure to pay the benefits. There's an interesting similarity here between this case and the Hangarder case. In the Hangarder case, the Court may remember – I can't remember if it's Dr. or Ms. Hangarder – the plaintiff, when she became ill, actually did hire somebody to take over her practice for several years in an effort to keep working. That's what Dr. Simo wanted to do. And she testified quite clearly that had she had the money from the benefits, she would have been able to hire someone to come in and save her practice. The loss of her practice meant more to her than the money. The jury could see that. They heard her testify for over two days between cross – or direct and cross examination. The jury was in an excellent position to evaluate that. General American essentially sold her the policy, saying, if you become disabled, we'll protect you against all this. You'll have the funds to – the flexibility to hire people if you need, or you'll have the money to take the time to get the is essentially what they said, to protect you from just these sort of losses. The question is, was it unreasonable, outrageous, and beyond all measure for the jury to equate the loss of benefits with emotional and mental distress that she suffered, knowing that that's exactly how the policies were sold? Our suggestion is that that's – there was more than adequate evidence to support the jury's verdict. Moving to the punitive award, I want to focus the – Counsel, before you go there, could you please address opposing counsel's assertion that Provident Life was not a proper defendant? Yes, I can. I think the quickest way to respond to that, Your Honor, is to look at the supplemental excerpt of the record 1. It's filed by us. Supplemental excerpt 1, page 337. And this is a fascinating letter. There's lots of other evidence, circumstantial and direct, but it's all in this one letter. It's a letter from General American to Provident Life. So the people who sold her the policy to Provident Life regarding Paul Revere claims handling of General American claims. And if you look at that letter, what you'll see is there's reference to Worcester. I'm writing to talk – it's two high-level executives, one from General American and one from Provident Life. And they're very high-level executives, and they're saying the subject is how are we handling the claims in Worcester. Well, Worcester is where Paul Revere was. And that's all through the documents. Worcester and Paul Revere are synonymous. So this letter is about how are we going to handle or how are you handling the Paul Revere. And Provident Life and Accident is who's basically calling the shots in this letter. And the dispute is about who's going to have the final call if a claim's going to be closed. Is it going to be General American or Provident Life and Accident? And Provident Life and Accident is saying, we get the final call on these General American claims adjusted by Paul Revere. And General American is saying, no, we wrote the policy, we get the final call. And they're looking at their agreement with each other and parsing it and saying, you know, who gets the right. And really, how that issue is resolved is irrelevant to the point I want to make, which is Paul Revere is – or Provident Life and Accident is clearly acting for Paul Revere in its negotiations with General American about closing claims and who's going to have the call on that. There's plenty of other testimony to that effect as well, Your Honor. The other interesting and easy place to look is the stipulation that was entered into, which I can find in just a minute. You've answered my question. All right. All right. Well, there's a stipulation at Supplemental Excerpt of Record 572 and 73 in which basically the stipulation is that once Paul Revere and Provident merged, it was just one claims organization handling the claims of all the companies. Going to the punitives, if I can find my notes, it's important to take a look at what this plan was. The plan was to balance the books of these insurance companies on the backs of their disabled policyholders, basically taking people that they've already found were disabled and terminating their claims or taking new claims that come in and denying them to meet artificial targets and goals to make the bottom-line targets that they had. The impropriety of that is evident in the record and also in cases going back 50 years. In four years, Paul Revere and Provident, as a direct result of these bad faith claims practices, reduced claim payments by over a billion dollars in just four years, a billion dollars. That was as of 1999. There's no indication they've stopped. And the question is, what is the appropriate punishment for a corporation that sought to cheat a disabled person out of 5 million in benefits and caused 5 million in emotional distress in the process? But the question is also, what is the appropriate punishment for a corporation that did this as part of a scheme to cheat tens of thousands of people, disabled people, out of benefits they were due to the tune of billions of dollars? Judge Martone said the conduct justified the maximum punitive award allowed by the Constitution. How could that not be right? How could that not be right? And the point I would like to make in the couple minutes I have left is an argument that we put in the brief but I think deserves more emphasis. The focus of punitive damages and the constitutional limits on punitive damages focus on the individual defendants. We were concerned the defendants originally proposed a verdict form that did not require separate awards of punitive damages. The jury is just going to do a gross award for all three. I suggested below that there should be a blank next to each defendant's name, because in theory they could find General American more or less culpable than Paul Revere and so on. The defendants made clear they wanted this form, and that's at trial transcript 1703 and 1704. So we have a gross award of $79 million. But each defendant is not paying that award. And when you do the ratio analysis, what you have to remember is essentially each defendant is responsible for approximately $26 million, which gets us to a ratio of about 2.5 to 1. That's well within the defendant's concession in their second brief at page 72 that where compensatory damages are substantial, ratios of 2 to 1 or 4 to 1 may be permissible if the conduct involved is highly reprehensible. So isn't that argument a little inconsistent with your prior argument that this was one claims organization? I don't think so, Your Honor, because it is the equivalent of if three people decide to hold up a bank, it's one enterprise, it's one conspiracy, if you will. They're seeking $79 million. One drives the car, one holds the gun, and one does something else. They're all responsible for the conduct. Here they pooled their resources, and they didn't buy a car. They bought a claims organization. Here they pooled their resources and solicited claims from other companies like General American. But they're working together to accomplish an objective. What is the objective? On a micro level, the objective is to take $5 million from Joanne Simo. On a macro level, it's to take billions of dollars from lots of disabled people. That scheme, all three of them engaged in. And when you talk about punishing them for that scheme, their culpability may be, again, it's the same as the bank robbery example. You would not have three bank robbers then splitting a presumptive sentence because there were three of them doing the robbery. That's a little different. Not much. The what you have are three entities operating together to accomplish an objective. In this case, steal $5 million. If you're going to talk about how do you punish them, they each are culpable and need to be punished for their conduct. They each are guilty, if you will, of intending to steal $5 million. And the question is what's the appropriate punishment for that? I would suggest to the court that that requires a ratio analysis of dividing. The difference is that for each defendant is tried separately, and that's not what happened in this particular case. If you had three criminal defendants, each of the defendants would be tried separately. The culpability of each would be determined by the jury separately. And so it's a little different in that regard. That's why I said it's hard to ---- Well, I understand your point, but I guess in response to that, I would note that often defendants are tried together. Sometimes they're not. Sometimes they are. The verdicts are always separate. That's right. And the defendants here had the option for separate verdicts, and they specifically rejected it. And as Judge Martone wrote several times and commented several times ---- And perhaps for that very reason, for the reason that you're arguing that it should be split, that's why they didn't want the separate verdicts for each one. That's right. That may be. But if you look at the purposes behind the ratio, which is I guess my point, if you look at the purposes behind the ratio, it's that each of these defendants should be punished and deterred for their conduct, which requires that split of the ratio. I understand your argument.  Thank you, counsel. Rebuttal. First, Your Honor, I'd like to come back to you on the preservation point on the jury instruction and read from pages 978 to 979 of the excerpts of record. Mr. Griffin, who's our guy, if you say that I'm a trial lawyer, you have to go and see am I really a trial attorney and how much of that constitutes my practice. And that's really the question that the jury has to answer in the first place. And what our concern is, is they want to use this instruction to tell the jury that if you find that she does any invasive procedures, no matter what small percentage of her practice it is, by this instruction you have to find that she's totally disabled because she can't do invasive procedures. That's precisely the argument. Then he comes back on the next page and says it's the equivalent of taking back your denial of summary judgment, which is the same as directing a verdict if you're taking back a denial of summary judgment. So that's the preservation point. Taking back a denial of summary judgment leaves it to the jury to decide, not directing a verdict. No. A denial means it goes to the jury. Taking it back means you're granting it. And that's what he was basically saying. It's another way of saying you're basically directing the jury on this issue. Taking back a denial of summary judgment means that you're granting the summary judgment? Yes. It's the negative, right? Not necessarily, no. But I understand your argument. Well, if you will read 979 at your leisure, I think you'll see that's exactly the point he was making. Mr. Friedman uses the analogy of himself. No one would hire him if he couldn't go to court. But that's not the way Dr. Simo's practice worked, and her experience in the ensuing year proved it. She had more work than she had before. People were still coming to her. So she was not like Mr. Friedman. If Mr. Friedman was unable to speak or, you know, had stage fright or something and couldn't try a case, because everything he does revolves around his ability to be in court, he would be totally disabled. But that simply isn't Dr. Simo's situation. Judge Rievele, on your question about or point about the regular occupation, yes, that's what the policy says if you can't perform the duties of your regular occupation. But it doesn't say you get to say what your regular occupation is, and it doesn't matter what all your duties are. The whole point is that her occupation is what is defined by her duties. And so the insured fills this format and says what her duties are, and if she can't do some of them, the question is, you know, is she partial or total, depending on what the percentage is. What's your response to opposing counsel's representation that there is a residency program for invasive cardiology, and that's kind of an acknowledgement that this is a job? It's true it requires extra training, but again, the question is, once you've got that credential, if it only forms a small part of what you do, and if your other duties are not inextricably intertwined with it so that they will fall by the wayside if you can't do that duty, then you're not totally disabled. So there's nothing inconsistent about there being a certification program and it taking a lot of work. On the provident life point, this is, I think, very, very important. This document, which we've addressed, page 26, note 16 of our red brief, true, it was addressed by this guy at General American to someone who, to a provident life and accident address, but there is no question on the record that it was provident companies that was doing the claims handling. There would be no point to provident life was simply another subsidiary. There was no reason for it to have any involvement in this handling of the General American Book of Claims. Paul Revere first had it, then provident companies became Paul Revere's parent. So naturally, provident companies would have some interest and involvement, and this letter was sent to Tim Arnold in his capacity as an executive of provident companies, even if Mr. Casalco wrote provident life and accident. There is nothing in the record that suggests that provident life and accident, a totally separate subsidiary, had any reason to be involved in this claim or did anything in this claim. On the emotional distress point, Mr. Friedman is asking you to uphold an award that would be roughly ten times the current record holder for any bad faith emotional distress award anywhere in the country. The only testimony in this case was she was frustrated. If you do that, the sky will be the limit. There will never be another case in which an award in the millions of dollars can be challenged as excessive. It is just opening the Pandora's box there. If you look at the cases we cited, the awards for this kind of thing are down in the $50,000 or $100,000 range. They're not in the multimillion dollar range. Finally, just one point on the punitive damages. Their entire case, their entire institutional case, is built on the false equation of terminations with unfair denials of claims. There are many ways that claims become terminated. Some are denials. Many, if not all of those, are correct denials. But there's also people going back to work. There are people dying. There are people whose benefits period expires. All of those things constitute terminations. There is not a whiff of evidence in this case of even one wrongful denial. So the equation that the facile equation the plaintiffs make in order to try to get you to uphold another record-breaking punitive award is simply not supported in the record, Your Honors. All right, counsel. We understand your argument. You've exceeded your time. Thank you to both counsel for your arguments. The case just argued is submitted for a decision by the court, and this court will be in recess for five minutes. Thank you. Speak. Thank you.  All rise. This court now is in session. Thank you. The final case on calendar for argument today is Friendly House v. Napolitano. May it please the Court. My name is Hector Viagra. I'm here on behalf of the Plaintiff Appellants.
judges: Goodwin, Reavley , Rawlinson